UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

E.E.,

                    Plaintiff,

          v.

KILOLO KIJAKAZI,

                    Defendant.

Case No.  21-cv-02104-JCS

**ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 23, 25

## I.      INTRODUCTION

Plaintiff E.E.[1] applied for disability insurance benefits under Title II of the Social Security Act on August 18, 2017 for disability that began on October 7, 2016.  Her claim was denied first on March 14, 2018 and again upon reconsideration on September 24, 2018, and following a hearing held on January 30, 2020, an Administrative Law Judge ("ALJ") issued an unfavorable decision on April 7, 2020.  E.E. brings this action challenging the final decision of Defendant Kilolo Kijakazi, Commissioner of Social Security ("Commissioner") finding her not disabled under the Social Security Act and therefore not eligible for disability benefits.  The parties filed cross motions for summary judgment pursuant to Civil Local Rule 16-5.  For the reasons discussed below, E.E's motion is GRANTED, the Commissioner's motion is DENIED, and the case is remanded for further administrative proceedings consistent with this order.[2]

## II.     BACKGROUND

E.E. has a high school education and reported that she held positions as an analyst at an

---

[1] Because this order contains potentially sensitive medical information and orders of the Court are more widely available for access than other filings, this order identifies E.E. only by her initials. This order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil procedure and Civil Local Rule 5-1(c)(5)(B)(i).

[2] The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).

electric and gas company and as an assistant at a contractor.  Admin. Record ("AR," dkt. 18) at 232.  She stopped work on October 7, 2016, purportedly due to disability.  *Id.* at 231.  E.E. reported that several conditions limited her ability to work, including diabetes, heart problem, kidney disease, high blood pressure, chronic anemia, urinary tract infection ("UTI"), coronary artery disease ("CAD"), myalgia, mediastinitis, and high creatine phosphokinase ("CPK") level. *Id.* at 230.  She reported that while she has seen doctors for physical conditions, she has not sought care for any mental conditions.  *Id.* at 234.

### A.    Summary of Medical Treatment and Medical Opinions

E.E. was seen by Dr. Emily L. Richie, M.D., her primary care physician, on February 27, 2017 at UCSF Medical Center for type 2 diabetes.  *Id.* at 378.  E.E. reported concerns about her heart, including that she had chest pain when walking one to two blocks and that the pain would worsen on hills.  *Id.*  Dr. Richie's notes indicate that E.E. had a stent placed in her coronary artery in 2012.  *Id.*  She also reported using a treadmill for 30 minutes per day and experiencing little to no chest pain from that exercise.  *Id.*  At this visit, Dr. Richie observed "slowish" capillary refill and mild hyperpigmentation of old sores on E.E.'s legs.  *Id.* at 379.

E.E. had an x-ray of her chest performed on March 23, 2017, which showed a "[r]ight upper lobe cavitary appearing nodule," which "could represent focus of cavitary infection, including tuberculosis, or tumor."  *Id.* at 540–41.  Otherwise, her lungs and cardiac contours were normal.  *Id.* at 541.  E.E. also had a study of her carotid arteries performed on March 23, 2017, which showed signs of coronary artery disease.  *Id.* at 532.

On March 24, 2017, E.E. visited Scot H. Merrick, M.D., a surgeon, with unstable angina and coronary artery disease for the following operations: triple coronary artery bypass graft, left internal mammary artery pedicle graft, endoscopic saphenous vein harvesting, and left radial artery bypass graft.  *Id.* at 381.  A post-operation chest x-ray on March 29, 2017 showed "[h]azy perihilar and basilar opacities which may reflect atelectasis or pulmonary edema . . . unchanged with probable small bilateral pleural effusions," and "[u]nchanged enlarged cardiomediastinal silhouette."  *Id.* at 1117.  E.E. was discharged on April 3, 2017.  *Id.* at 388.  E.E. met Dr. Merrick for a follow-up to her coronary bypass surgery and pleural effusion, and Dr. Merrick noted that

United States District Court
Northern District of California

United States District Court
Northern District of California

E.E. "had no issues" since her last visit, and that "[s]he denie[d] shortness of breath orthopnea or PND," and was "[b]ecoming more active" and her "appetite [was] good."  *Id.* at 396.  On May 8, 2017, E.E. underwent a chest CT scan, which showed "[s]ternotomy wound infection with evidence of dehiscence and sternal osteomyelitis," "[f]indings consistent with mediastinitis, including gas and soft tissue density in the anterior mediastinum," and "[m]ild pulmonary edema." *Id.* at 414.

On August 11, 2017, E.E. returned to Dr. Richie with a "new onset of myalgias" as well as "pain in [her] chest when moving about," pain in her back, legs, and lumbar area, and some weakness in her legs.  *Id.* at 1784.  At this time, she reported exercising for fifteen minutes on the treadmill, but "had to stop cardiac rehab" because of her muscle symptoms.  *Id.*  The progress notes from this appointment indicate that E.E. asked about applying for disability and had paperwork to complete.  *Id.* at 1785.  Dr. Richie's examination revealed "[b]ilateral tender muscles in [E.E.'s] legs" and "[m]ild stiffness of gait."  *Id.*

At a follow-up with Dr. Richie on August 28, 2017, E.E. reported her muscles continued to ache, but less, and that she was doing "a little walking" for exercise.  *Id.* at 1793.  Dr. Richie also performed a physical assessment for E.E. on August 28, 2017, stating that E.E. suffered from coronary artery disease, type 1 diabetes, chronic kidney disease, and hypertension.  *Id.* at 324.  Dr. Richie stated that E.E. would "need to recline or lie down during a hypothetical 8-hour workday," could walk one block "without rest or significant pain," could sit for one hour total in an eight-hour workday, could not stand or walk in an eight-hour workday, and would need to take six to eight unscheduled twenty-minute breaks during an eight-hour workday.  *Id.*  Additionally, Dr. Richie stated that E.E. could occasionally lift less than ten pounds; had limitations in doing repetitive reaching, handling, or fingering; and would likely be absent from work more than four times per month as a result of her impairments.  *Id.* at 324–25.

On September 8, 2017, E.E. was seen by Yerem Yeghiazarians, M.D., a cardiology specialist, who noted E.E. was experiencing pain in the back of her knees that was "unlikely to be

United States District Court
Northern District of California

vascular in nature," and "could be due to Baker's cyst."[3]  *Id.* at 426, 1802, 1807.  On October 17, 2017, E.E. was seen by Martha N. Kennedy, M.D., an endocrinology and metabolism specialist, whose progress notes indicate that E.E. was engaging in "light" exercise of using "a treadmill, bike, nu-step, or elliptical 1–3 times a week for about 1 [hour]," and that she felt "diabetes [had] caused problems with her family, life, work and sports."  *Id.* at 341, 421, 1837.

On December 20, 2017, E.E. was seen by Victoria C. Hsiao, M.D., an endocrinology and metabolism specialist, regarding her diabetes, and Dr. Hsiao's notes from that visit indicate that she "[w]alked 15000 steps/day in Europe."  *Id.* at 426, 436.  On January 31, 2018, E.E. saw Dr. Hsiao again, who noted that E.E. was "very busy over [the] holidays, ate more, but walked more too."  *Id.* at 443.  Dr. Hsiao also noted that E.E. had "incisional pain with lying on [her right] side," and that she experienced muscle tightness while walking two to three blocks.  *Id.*  In Dr. Hsiao's notes reviewing E.E.'s symptoms, E.E. was experiencing various types of discomfort, including "joint pain/stiffness," "muscle pain/cramps/weakness," "back pain," "chest pain/angina," and "shortness of breath when walking or lying flat."  *Id.* at 444–45.

On March 9, 2018, E.E. was seen by Blake R. Charlton, M.D., a resident, who reported that she complained of sternal pain described as a three or four out of ten for the past year that was getting worse, and that the pain was "particularly bad when taking a deep breath," "worse when laying on her back or side," and she had "difficulty sleeping and [slept] partially sitting up."  *Id.* at 448-49.  E.E. also "continue[d] to have posterior knee pain" that was worse in the morning, could "walk 2 blocks on flat ground and [could] climb 2 flights of [stairs] without symptoms," and was "limited by fatigue and leg tiredness."  *Id.*  E.E. then was seen by Melinda M. Gu, M.D. on March 13, 2018, and complained of "[w]orsening right shoulder pain and chest wall pain on palpitation," "[l]imited range of motion of right shoulder due to pain," and "right chest wall pain" that was worsened when taking deep breaths.  *Id.* at 456.  E.E. described the worst pain as anywhere from a five to a seven out of ten.  *Id.*

On March 14, 2018, J. Allen, M.D. completed an assessment of E.E.'s capacity, finding

---

[3] A Baker's cyst can be caused by a degenerative knee condition or knee injury.

that she could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk with normal breaks for a total of six hours in an eight-hour workday, and sit with normal breaks for a total of six hours in an eight-hour workday. *Id.* at 68–69. Dr. Allen also found that E.E. could occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl; could never climb ladders, ropes or scaffolds; and should avoid even moderate exposure to hazards such as machinery and heights. *Id.* at 69–70. On June 11, 2018, K. Lee, M.D. made the same assessment of E.E.'s capacity. *Id.* at 88–90.

On July 20, 2018, E.E. visited Dr. Richie and reported dizziness, shortness of breath, and tight chest pain in her surgical wound area as well as pain that was worse when lying on her side. *Id.* at 1861. She added that she sometimes had to stop and catch her breath while watching television, she would have to stop and rest after walking two blocks, and she had a low tolerance for exercise for months. *Id.* After completing a physical examination, Dr. Richie assessed that E.E. could try to increase stamina by walking and could use two puffs of an inhaler twice a day to help with shortness of breath. *Id.* at 1862.

On August 28, 2018, E.E. underwent a complete psychological evaluation with Ute Kollath, Ph.D., a clinical psychologist. *Id.* at 463. The evaluation describes E.E's "current level of functioning" as the following:

> The claimant reported having physical limitations due to medical problems. She is independent for basic ADL's. She does need help with preparing meals. She chooses not to drive. She is able to make change at the store. The claimant typically spends her day at appointments, with church activities, or resting.

*Id.* at 460. Dr. Kollath reported E.E.'s mood as "depressed," and her cognitive and emotional functioning both as "impaired." *Id.* at 461. Additionally, E.E. reportedly "presented with limited attention and concentration and frequently asked to have questions and instructions repeated." *Id.* Dr. Kollath reported that E.E. was moderately impaired in her abilities to follow complex or detailed instructions, maintain adequate pace or persistence to perform complex tasks, maintain adequate attention or concentration, adapt to changes in job routine, withstand the stress of a routine workday, and adapt to changes, hazards, or stressors in the workplace setting. *Id.* at 462.

On March 4, 2019, E.E. visited Dr. Richie for back pain and reported "fatigue and pain in

United States District Court
Northern District of California

her legs after walking about 2 blocks." *Id.* at 1895.  She visited Dr. Richie again on April 24, 2019 and complained of pain in her posterior left knee as well as back pain.  *Id.* at 1902.  During that meeting, Dr. Richie also completed a DMV disability form for E.E.  *Id.* at 1903.  Dr. Richie further noted that E.E.'s diabetes remained "uncontrolled," and that she should make changes to her diet.  *Id.*

On May 3, 2019, Anjali K. Asrani, Nurse Practitioner ("N.P.") examined E.E., focusing on her endocrine systems and related symptoms.  *Id.* at 1905.  Notes from that visit show that E.E. did "not drive," was "travelling a lot," and had a normal cardiovascular report, but had other symptoms including "muscle pain/cramps/weakness," "back pain," "shortness of breath," and "trouble with memory."  *Id.* at 1905–06.

On September 20, 2019, Dr. Yeghiazarians saw E.E., and she complained of "DOE[4] with 2-3 blocks of walking."  *Id.* at 1922.  During this visit, E.E. also complained of "pain behind the knee."  *Id.*

On January 6, 2020, Dr. Richie noted that E.E. had "coronary artery disease that limits walking to one block or half flight of stairs" and "daily chest pain and shortness of breath due to heart and asthma," and that E.E.'s "diabetes [was] affecting [her] nerves and kidneys with peripheral neuropathy and chronic kidney disease stage 3."  *Id.* at 4674.  Dr. Richie reported to E.E.: "Your primary doctor has advised you that you are disabled and cannot work."  *Id.*  On January 10, 2020, Dr. Richie wrote a letter to Philippine Airline reservations stating that due to E.E.'s medical conditions and specifically her "weakness, inability to handle her luggage, inability to walk the distances needed to traverse airports, and her risk of low or high blood sugar," she required certain accommodations for travel, including needing her husband to accompany her and assist with luggage.  *Id.* at 4673.

### B.    E.E.'s Hearing

At E.E.'s hearing on January 30, 2020, she testified that she last worked in October of 2016 and used to work at PG&E as an analyst and at agencies doing clerical or secretarial work.

---

[4] "DOE" stands for dyspnea on exertion, which is the feeling of running out of air.

1    *Id.* at 43.  She also testified that she took care of her disabled mother for a month or two for a few

2    hours per day.  *Id.* at 44.

3         E.E then explained that she first had a surgery involving her heart in 2012, during which

4    stents were placed, which did not prevent her from working at that time.  *Id.* at 44–45.  She

5    explained that in 2016, when her year-long contract as a clerk ended, she began "feeling really bad

6    about [her] heart," could not walk long, and had shortness of breath.  *Id.* at 46.  She did not "have

7    a good insurance" while not working until 2017, when she was able to be covered under Covered

8    California.  *Id.*  E.E. explained that once she got insurance, her doctors began testing her and

9    ultimately performed a bypass in March of 2017.  *Id.*  Then, in May, she developed an infection,

10   which she described as "a lot more painful" than the bypass surgery itself.  *Id.* at 47.

11        E.E. testified that since the surgery and subsequent infection, she needed help around the

12   house, and her husband stopped working "just to support [her]."  *Id.*  She also explained that

13   physically, her condition has worsened since 2017, specifically including her chest pain around the

14   wound from her surgery, vertigo, and pain in her back and legs.  *Id.* at 47–48.  She testified that

15   her level of concentration or focus is "really bad," she does not drive anymore, and her husband or

16   daughter helps her with shopping.  *Id.* at 49.  She explained that she needs somebody with her

17   even when walking due to her vertigo and diabetes, in case her blood sugar goes down.  *Id.* at 49–

18   50.  She also reported other difficulties related to walking, including that she uses an inhaler every

19   morning to go up the stairs in her house, she always has pain and weakness in her legs, and she

20   has "no energy." *Id.* at 50.  E.E. testified that there was "no way" she would be able to do her

21   previous job anymore due to her physical condition, specifically saying that she cannot sit or stand

22   for long periods of time, take public transportation, or walk far.  *Id.* at 52–53.

23        E.E. also testified to details about her travels over the past few years to the Philippines,

24   New York, and Europe.  *Id.* at 51, 54–55.  She explained that on her travels, she needs her

25   daughter or her husband to help her walk because of her pains.  *Id.* at 51.  She testified that there

26   were various purposes for the trips, including an event she had to attend in New York, to see

27   sights in Europe of religious significance to her and her family, and to see family in the

28   Philippines.  *Id.* at 54.  She added that in the Philippines, she was able to relax and not "do

1    anything" as she visited family there. *Id.*

2        A vocational expert, Mr. Schmidt, also testified at the hearing and provided perspective on

3    E.E.'s ability to perform work. *Id.* at 56–58.  Mr. Schmidt testified to a series of hypotheticals,

4    including that an individual would be able to perform E.E.'s past job if their stand and walk time

5    and lifting time was reduced during the day, and that the same individual would not be able to

6    perform E.E.'s past job if they were off task for ten percent of the day due to cardiac-related

7    symptoms. *Id.* at 57.  Additionally, Mr. Schmidt testified that if the same individual needed the

8    option to stand up or sit down as needed, they would not be able to perform E.E.'s past job. *Id.* at

9    58.

10        **C.    Regulatory Framework for Determining Disability**

11        An individual can claim disability insurance benefits under the Social Security Act if they

12   are unable "to engage in any substantial gainful activity by reason of any medically determinable

13   physical or mental impairment which can be expected to result in death or which has lasted or can

14   be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A);

15   *see also* 42 U.S.C. § 423(a)(1).  A claimant can only be found disabled "if [their] physical or

16   mental impairment or impairments are of such severity that [they are] not only unable to do [their]

17   previous work but cannot, considering [their] age, education, and work experience, engage in any

18   other kind of substantial gainful work."  42 U.S.C. § 423(d)(2)(A).

19        Social Security Administration ("SSA") regulations set out a five-step process to determine

20   whether a claimant is disabled. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing

21   20 C.F.R. § 404.1520).  For steps one through four, the claimant bears the burden of proof, and the

22   burden shifts to the Commissioner for step five. *See id.*

23        First, the ALJ considers whether the claimant is presently "doing substantial gainful

24   activity."  20 C.F.R. § 404.1520(a)(4)(i).  If so, the ALJ finds that the claimant is not disabled. *Id.*

25   If not, the ALJ moves to step two. *Id.*

26        Second, the ALJ considers whether the claimant has "a severe medically determinable

27   physical or mental impairment . . . or a combination of impairments that is severe" that meets the

28   regulation's 12-month duration requirement.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii).  A

United States District Court
Northern District of California

8

United States District Court
Northern District of California

1    "severe impairment" is an "impairment or combination of impairments which significantly limits

2    [one's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the

3    ALJ concludes that the claimant does not have a severe impairment, the claimant is found to not

4    be disabled.  20 C.F.R. § 404.1520(a)(4)(ii).  If the ALJ concludes that the claimant has a severe

5    impairment, they move to step three.  *Id.*

6           Third, the ALJ considers the medical severity of the impairment compared to a list of

7    impairments the Commissioner has deemed sufficient to establish disability.  20 C.F.R. §

8    404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If one or a combination of the

9    claimant's impairments meets or equals the severity of a listed impairment, the claimant is

10   disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  If not, the ALJ moves to step four.  *Id.*

11          Fourth, the ALJ assesses the claimant's residual functional capacity ("RFC") and past

12   relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  A claimant's RFC "is the most [they] can still do

13   despite [their] limitations," and RFC is assessed "based on all the relevant evidence in [the

14   claimant's] case record."  20 C.F.R. § 404.1545(a)(1).  The ALJ then determines whether, given a

15   claimant's RFC, they can still do their past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  "Past

16   relevant work is work that [a claimant has] done within the past 15 years, that was substantial

17   gainful activity, and that lasted long enough for [them] to learn to do it."  20 C.F.R. §

18   404.1560(b)(1).  If the ALJ finds that the claimant can still perform their past relevant work given

19   their RFC, then the ALJ finds that the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).  If

20   the ALJ finds that the claimant cannot perform their past relevant work, the ALJ moves to step

21   five.  *Id.*

22          Fifth, the burden shifts to the Commissioner and the ALJ considers the RFC assessment

23   and the claimant's "age, education, and work experience to see if [they] can make an adjustment to

24   other work."  20 C.F.R. § 404.1520(a)(4)(v).  To meet this burden, "[t]he Commissioner must

25   identify specific jobs existing in substantial numbers in the national economy that claimant can

26   perform despite [their] identified limitations."  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir.

27   1999) (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)) (internal quotation marks

28   omitted).  If the ALJ finds that the claimant can make the adjustment, the ALJ finds that the

claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(v).  If the ALJ finds that the claimant cannot make the adjustment, the ALJ finds that the claimant is disabled.  *Id.*

### D.    ALJ Decision

Following the hearing, the ALJ issued an unfavorable decision for E.E. on April 7, 2020. *Id.* at 18.  The ALJ found that E.E. met the insured requirements of the Social Security Act through December 31, 2021, has not engaged in substantial gainful activity since October 7, 2016, and has severe impairments including coronary artery disease post bypass surgery, insulin dependent diabetes mellitus, asthma, hypertension, and anemia.  *Id.* at 23.  However, the ALJ also found that E.E. did not have an impairment that met the severity of one of the listed impairments in 20 C.F.R. Part 404, had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b), and could perform past relevant work as an administrative assistant and secretary, and therefore E.E. was not disabled from October 7, 2016 until the date of the decision. *Id.* at 26–31.

The ALJ found that although E.E. "had a brief period when she may have had significant limitations while she recovered from surgeries in 2017, her alleged level of restriction is not fully supported throughout the relevant period," and that "[i]n contrast to her severe allegations, [E.E.] retains a remarkable level of functionality."  *Id.* at 27.  The ALJ cited E.E's frequent travel, her ability to perform personal care activities, and her exercise as evidence that was "inconsistent with her allegations of constant and debilitating fatigue."  *Id.*  The ALJ also found that Dr. Richie's opinions "ha[d] limited probative value and were not persuasive," stating that the medical evidence did not support Dr. Richie's assessments about E.E.'s capabilities in performing basic tasks, and that her conclusions were not consistent with E.E.'s ability to travel.  *Id.* at 30.  The ALJ therefore concluded that E.E. could perform past relevant work in the role of an administrative assistant or secretary and found E.E. not disabled under sections 216(i) and 223(d) of the Social Security Act.  *Id.* at 30–31.

### E.    The Parties' Motions

E.E. moves for summary judgment, asking this Court to vacate the Commissioner's decision and remand the matter to the Commissioner for further administrative proceedings,

United States District Court
Northern District of California

1   including a new hearing and decision.  *See generally* Pl.'s Mot. (dkt. 23).  E.E. contends that the

2   ALJ's determination was "unsupported by substantial evidence as she failed to properly evaluate

3   the opinion of treating medical source Emily Richie, M.D."  *Id.* at 14.  E.E. seeks "that the

4   Commissioner's decision be vacated and that [the] matter be remanded to the Commissioner for

5   further administrative proceedings including a *de novo* hearing and new decision."  *Id.* at 18.  E.E.

6   does not argue for an award of benefits without further administrative proceedings.

7            The Commissioner's cross-motion for summary judgment seeks for this Court to affirm the

8   ALJ's decision finding that E.E. is not disabled.  *See generally* Def.'s Mot. (dkt. 25).  The

9   Commissioner contends that the ALJ properly applied the new SSA rules adopted on January 18,

10  2017.  *Id.* at 3.  Specifically, the Commissioner contends that the ALJ properly found that Dr.

11  Richie's opinions were "poorly supported and inconsistent with [E.E's] frequent international

12  travel, activities, and a medical record showing [E.E.'s] impairments had stabilized."  *Id.* at 4.  The

13  Commissioner focuses on three purported inconsistencies that the ALJ identified "between Dr.

14  Richie's opinion and the record," including inconsistencies between Dr. Richie's opinion and

15  E.E.'s travel, E.E.'s exercise activities, and the medical record.  *Id.* at 5.

16           E.E.'s reply reaffirms her argument that the ALJ's decision be vacated, and the action be

17  remanded for a new hearing and decision.  *See generally* Pl.'s Reply (dkt. 26).  She contends that

18  Dr. Richie's opinion was not inconsistent with the record.  *Id.*  Specifically, E.E. contends that her

19  ability to travel with assistance did not conflict with Dr. Richie's conclusions, that her engaging in

20  exercise was not inconsistent with Dr. Richie's assessment of her capabilities, and that the

21  Commissioner "relied on a selective reading of the medical record" to show that E.E.'s condition

22  had stabilized when there was also evidence of E.E.'s continued pain.  *Id.* at 2–3.

23  **III.    ANALYSIS**

24           E.E. contends that she is disabled under the Social Security Act and seeks reversal of the

25  ALJ's unfavorable opinion.  At issue in this case is whether the ALJ erred in finding that E.E. has

26  the RFC to perform light work and can perform past relevant work, and that E.E. is therefore not

27  disabled and not entitled to benefits.  The only error that E.E. asserts is the ALJ's rejection of the

28  opinion of E.E.'s treating physician, Dr. Richie.  Therefore, this Court must evaluate the ALJ's

United States District Court
Northern District of California

11

1  rejection of Dr. Richie's opinion to determine if the ALJ's unfavorable decision was appropriate.

2      **A.    Standard of Review**

3        District courts have jurisdiction to review final decisions of the Commissioner and may

4  affirm, modify, or reverse the Commissioner's decisions with or without remanding for further

5  hearings.  42 U.S.C. § 405(g); *see also id.* § 1383(c)(3).  When reviewing a decision of the

6  Commissioner, courts "may set aside . . . denial of disability insurance benefits when the ALJ's

7  findings are based on legal error of are not supported by substantial evidence in the record as a

8  whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).  The Ninth Circuit has held

9  "substantial evidence" to be "more than a mere scintilla" but "less than a preponderance." *Matney*

10  *ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992) (citing *Richardson v. Perales*, 402

11  U.S. 389, 401 (1971); *Desrosiers v. Sec'y of Health & Human Servs.,* 846 F.2d 573, 576 (9th Cir.

12  1988)).  Additionally, "the Commissioner's decision cannot be affirmed simply by isolating a

13  specific quantum of evidence." *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d

14  1240, 1243 (9th Cir. 1998)) (internal quotation marks omitted).  Courts "consider the record as a

15  whole, weighing both evidence that supports and evidence that detracts from the . . . conclusion."

16  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).

17      **B.    The ALJ Erred in Rejecting Dr. Richie's Opinion**

18        Dr. Richie was E.E.'s treating physician and had followed E.E.'s care for no less than three

19  years.  AR at 4673.  The ALJ's conclusion that E.E. is not disabled rests on her finding that "[t]he

20  opinions of Emily Richie, MD, have limited probative value and were not persuasive." *Id.* at 30.

21  The first of Dr. Richie's opinions which the ALJ rejected was that, in 2017, E.E. "could walk,

22  stand, or sit for less than 1 hour per day[5]; her symptoms would often interfere with [her]

23  performing even simple tasks; she would require 6–8 unscheduled work breaks of up to 20

24  minutes per day; she could occasionally lift less than 10 pound, but never more; she had

25  significant handling restrictions; and would miss more than 4 days of work per month." *Id.*  The

26  second was Dr. Richie's letter, written in January of 2020, "stating that [E.E.] needed to be

27   

28     [5] Dr. Richie's physical assessment of E.E. indicated that E.E. could sit for one hour and stand or walk for zero hours in an eight-hour workday.  AR at 324.

United States District Court
Northern District of California

1    accompanied when travelling, due to weakness, inability to handle her luggage, inability to walk

2    the distances needed to traverse airports, and her risk of low or high blood sugar." *Id.*  The ALJ

3    found that these opinions were inconsistent with (1) the medical record and (2) E.E.'s travel and

4    exercise. *Id.*

5                    **1.    Legal Standards for ALJ Consideration of Medical Opinions**

6            The parties agree that because E.E. filed her application after March 27, 2017, it is

7    governed by the new regulations implemented that year rather than by Ninth Circuit precedent

8    taking a hierarchical approach to opinions of treating, examining, and consulting doctors in earlier

9    cases. *See* Pl.'s Mot. at 14 ("[T]he new rules apply here."); *Woods v. Kijakazi*, 32 F.4th 785, 792

10   (9th Cir. 2022) (applying the new regulations and noting that they are "are clearly irreconcilable

11   with our caselaw according special deference to the opinions of treating and examining

12   physicians").

13           Under the new regulations, the Commissioner "will not defer or give any specific

14   evidentiary weight, including controlling weight, to any medical opinion(s)."  20 C.F.R. §

15   404.1520c(a).  Instead, the Commissioner considers all medical opinions together using the

16   following five factors: (1) supportability, (2) consistency, (3) relationship with the claimant,

17   (4) specialization, and (5) "other factors."  20 C.F.R. § 404.1520c(c).  The ALJ must still

18   "articulate how [they] considered the medical opinions" and "articulate . . . how persuasive [they]

19   found] all of the medical opinions."  20 C.F.R. § 404.1520c(a)–(b).  "As with all other

20   determinations made by the ALJ, the ALJ's persuasiveness explanation must be supported by

21   substantial evidence."  *J.B. v. Kijakazi*, No. 20-cv-06231-VKD, 2022 WL 282513, at *3 (N.D.

22   Cal. Jan. 31, 2022) (citing *Patricia F. v. Saul*, No. C19-5590-MAT, 2020 WL 1812233, at *4

23   (W.D. Wash. Apr. 9, 2020)).

24           Of the five factors, supportability and consistency are "most important," and the ALJ must

25   "explain how [they] considered the supportability and consistency factors for a medical source's

26   medical opinions."  20 C.F.R. § 404.1520c(b)(2).  For supportability, "[t]he more relevant the

27   objective medical evidence and supporting explanations presented by a medical source are to

28   support [their] medical opinion(s) . . . the more persuasive the medical opinions . . . will be."  20

United States District Court
Northern District of California

1    C.F.R. § 404.1520c(c)(1).  For consistency, "[t]he more consistent a medical opinion[] . . . is with

2    the evidence from other medical sources and nonmedical sources in the claim, the more persuasive

3    the medical opinion[] . . . will be."  20 C.F.R. § 404.1520c(b)(2).  The ALJ "may, but [is] not

4    required to, explain how [they] considered" the remaining three factors.  *Id.*  However, when "two

5    or more medical opinions . . . about the same issue are both equally well-supported . . . and

6    consistent with the record . . . but are not exactly the same, [the ALJ] will articulate how [they]

7    considered the other most persuasive factors."  20 C.F.R. § 404.1520c(b)(3).

8            Relationship with the claimant, the third factor, is split into consideration of five issues:

9    length of the treatment relationship, frequency of examinations, purpose of the treatment

10   relationship, extent of the treatment relationship, and examining relationship.  20 C.F.R. §

11   404.1520c(c)(3)(i)–(v).

12           Specialization, the fourth factor, provides that a "medical opinion . . . of a medical source

13   who has received advanced education and training to become a specialist may be more persuasive

14   about medical issues related to [their] area of specialty than the medical opinion . . . of a medical

15   source who is not a specialist in the relevant area of specialty."  20 C.F.R. § 404.1520c(c)(4).

16           The fifth factor is a catch-all provision of "other factors," including "evidence showing a

17   medical source has familiarity with the other evidence in the claim or an understanding of [the]

18   disability program's policies and evidentiary requirements."  20 C.F.R. § 404.1520c(c)(5).  When

19   the ALJ "consider[s] a medical source's familiarity with the other evidence in a claim, [they] also

20   consider whether new evidence [they] receive after the medical source made his or her medical

21   opinion . . . more or less persuasive."  *Id.*

### 2.    The Medical Record and Dr. Richie's Opinions

23           The ALJ found that Dr. Richie's assessment of E.E.'s physical limitations were "not

24   supported by underlying evidence."  AR at 30.  The ALJ stated that while Dr. Richie in 2017 and

25   2020 "posited that [E.E.] was limited to less than sedentary work," the "underlying evidence" in

26   the medical record showed that E.E. "felt that her overall health was fair and that her diabetes was

27   fairly well controlled," that "[s]he was stable from a cardiovascular standpoint," and "[i]n 2019,

28   echocardiograms were normal."  *Id.*  For these assertions, the ALJ cited two visits: E.E.'s October

United States District Court
Northern District of California

1    2017 visit with Dr. Kennedy and the normal cardiovascular report from Anjali K. Asrani, N.P.

2    from May of 2019.  *Id.* at 1837, 1906.  However, these two visits do not paint a complete picture

3    either of E.E.'s condition from 2017 to 2020 or of the medical record.  Even under the new SSA

4    regulations, an ALJ cannot ignore evidence that cuts against their conclusions in assessing the

5    relevant factors.  The ALJ therefore erred in evaluating the supportability and consistency of Dr.

6    Richie's opinion.

7            For supportability, "[t]he more relevant the objective medical evidence and supporting

8    explanations presented by a medical source are to support [their] medical opinion(s) . . . the more

9    persuasive the medical opinions . . . will be."  20 C.F.R. § 404.1520c(c)(1).  So, the ALJ should

10   have examined whether Dr. Richie's medical evidence supported her conclusions about E.E.'s

11   physical limitations.  The ALJ did not do this, despite the volume of evidence in the record

12   describing the information that Dr. Richie had available to her about E.E.'s condition that could

13   support her opinions about E.E.  For example, after E.E.'s bypass surgery in 2017 and prior to Dr.

14   Richie's 2017 assessment about E.E.'s limitation to less than sedentary work, Dr. Richie saw E.E.

15   twice in August.  AR at 1784, 1793.  During these visits, E.E. complained of various types of pain

16   which limited her ability to exercise and move about, and Dr. Richie examined E.E. and found

17   "tender muscles in [E.E.'s] legs" and "[m]ild stiffness of gait."  *Id.* at 1785, 1793.  Further, prior to

18   Dr. Richie's 2020 letter describing E.E.'s limitations, Dr. Richie examined E.E. multiple times,

19   and during these visits E.E. continued to complain of symptoms related to her physical discomfort.

20   For example, E.E. saw Dr. Richie in July of 2018 and reported dizziness, shortness of breath, tight

21   chest pain in her surgical wound, and that she sometimes had to stop and catch her breath after

22   watching television, had to stop and rest after walking two blocks, and that she had a low exercise

23   tolerance for months.  *Id.* at 1861.  She also saw Dr. Richie in March of 2019 and reported back

24   pain and "fatigue and pain in her legs after walking about 2 blocks," and in April of 2019 she

25   visited Dr. Richie and complained of knee and back pain.  *Id.* at 1895, 1902.  If the ALJ had

26   correctly applied the new standards regarding supportability, she would have discussed the above

27   medical evidence that was available to Dr. Richie and determined whether Dr. Richie's opinions

28   were supported by said evidence.  *See* 20 C.F.R. § 404.1520c(c)(1).

For consistency, "[t]he more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be." 20 C.F.R. § 404.1520c(b)(2). While the ALJ cited two other medical sources (E.E.'s visits with Dr. Kennedy in October of 2017 and Anjali K. Asrani, N.P. in May of 2019) from the record which she found to be inconsistent with Dr. Richie's opinions, those two medical opinions do not provide a full picture of the other medical sources available in the record. For example, E.E. complained of various pain and other bothersome symptoms before and after the October 2017 visit with Dr. Kennedy. She reported pain in the back of her leg potentially due to a Baker's cyst in the September 2017 visit with Dr. Yeghiazarians. *See id.* at 1802, 1807. E.E. saw Dr. Hsaio in January of 2018 and complained of various pains including muscle tightness while walking two to three blocks. *Id.* at 443–45. E.E. saw Dr. Charlton in March of 2018 and reported sternal and knee pain and that she could walk two blocks on flat ground. *Id.* at 449. E.E. saw Dr. Gu in March of 2018 and reported she was having chest pains described as a five to seven out of ten at their worst. *Id.* at 456. And, during the very visit that the ALJ cites with Anjali K. Asrani, N.P. in May of 2019, E. E. had symptoms including "muscle pain/cramps/weakness," "back pain," "shortness of breath," and "trouble with memory." *Id.* at 1905–06. Further, E.E. complained of "DOE with 2-3 blocks of walking" and "pain behind the knee" in the September 2019 visit with Dr. Yeghiazarians. *Id.* at 1922. If the ALJ had correctly applied the new SSA standards regarding consistency, she would haver examined the other medical sources across the record to determine if Dr. Richie's opinions were consistent, rather than picking out two particular visits. *See* 20 C.F.R. § 404.1520c(b)(2); *see also V.R. v. Kijakazi*, No. 20-cv-03994-VKD, 2021 WL 5279813, at *3 (N.D. Cal. Nov. 12, 2021) (finding that an "ALJ's citation to . . . two treatment notes ignore[d] other notes that contradict[ed] the ALJ's conclusions"); *Holohan v. Massanari*, 246 F.3d 1195, 1207-08 (9th Cir. 2001) (concluding that an ALJ erred in disregarding certain medical opinions but considering others).

The ALJ also incorrectly applied the new SSA standards in evaluating the opinion of the

1   Disability Determination Service ("DDS") non-examining physicians.[6]  The ALJ stated that the

2   "State agency physical consultants' opinions [were] persuasive," explaining that "the DDS

3   opinions carry great weight because the doctors were privy to much of the record giving them a

4   longitudinal prospective," that "they are specialists in evaluating impairments and have experience

5   in evaluating claimants in the context determining disability," and their "opinions [were]

6   consistent with the medical evidence." *Id.* at 29–30.  The ALJ used these assessments of the

7   medical opinions to conclude, in assessing E.E.'s RFC, that the evidence showed "remarkable

8   improvement since her bypass surgery in 2017," and that E.E. "has gone on to lead an active

9   lifestyle." *Id.* at 30.  In making this conclusion, the ALJ did not address supportability, and she

10  also did not cite any specific evidence for consistency.  While it is possible that the DDS opinions

11  could be persuasive, the ALJ's rationale for concluding so is inconsistent with the framework set

12  out in the new SSA regulations.

13       The ALJ erred by misapplying the new SSA regulations to Dr. Richie's opinions and the

14  opinions of the DDS non-examining physicians.  This error warrants remand.

15           **3.    E.E.'s Travel and Exercise**

16       The ALJ also stated that Dr. Richie's opinions were unpersuasive because Dr. Richie's

17  opinions of E.E.'s limited physical abilities were "not consistent with [E.E.'s] activities traveling

18  around the world frequently since the alleged onset date."  AR at 30.  In her hearing, E.E.

19  described her travels to the Philippines, Europe, and New York, which were for the purposes of

20  visiting family, attending occasions, and seeing sights of religious significance.  *Id.* at 54; *see also*

21  *id.* at 436 (E.E. visited Dr. Hsiao in January of 2018 and reported that she "[w]alked 15000

22  steps/day in Europe"); *id.* at 1905 (notes from E.E.'s visit to Anjali K. Asrani, N.P. indicate she

23  traveled or planned to travel to New York, the Philippines, Canada, and Europe).  The ALJ cited

24  E.E.'s travel as evidence of her "ability to engage in an active lifestyle since her bypass

25  procedure," and found that that both Dr. Richie's 2017 physical assessment describing E.E.'s

26

27  _____

28  [6] While E.E.'s briefs do not specifically address the ALJ's treatment of these consulting
    physicians, the ALJ's error with respect to these doctors' opinions is a corollary to her insufficient
    treatment of Dr. Richie's opinions, which E.E. focuses on here.

1   physical limitations and Dr. Richie's 2020 note describing her limitations while traveling were

2   inconsistent with the travel.  *Id.* at 27, 30.

3        Another reason the ALJ gave for finding Dr. Richie's opinion unpersuasive was that Dr.

4   Richie's opinions of E.E.'s limited physical abilities were inconsistent with E.E.'s levels of

5   exercise.  AR at 30.  The specific instance of exercise the ALJ cited was that on October 18, 2017,

6   Dr. Kennedy noted that E.E. would "use a treadmill, bike, nu-step or elliptical 1–3 times a week

7   for about 1 [hour]."  *Id.* at 334, 1837.

8        The ALJ did not explain how exactly Dr. Richie's opinions of E.E.'s physical limitations

9   were inconsistent with E.E. traveling or engaging in the exercise described above, and she did not

10  address the evidence related to travel and exercise across the record that may have been contrary

11  to her opinion.  *Id.* at 30.

12       The ALJ did not cite any specific reasons why E.E.'s disability and her travel could not

13  coexist,[7] and the ALJ only cited one example of light exercise that Dr. Kennedy reported in

14  October of 2017 as evidence of E.E.'s living an "active lifestyle."  *Id.* at 27.  In doing so, the ALJ

15  failed to address the evidence in the medical record which showed E.E.'s physical limitations and

16  contradicted her conclusion that E.E. was physically capable of work.  For example, Dr. Richie

17  noted in August of 2017 that E.E.'s exercise consisted of fifteen minutes on the treadmill and light

18  walking.  *Id.* at 1784.  Dr. Hsiao noted in January of 2018 that E.E. experienced muscle tightness

19  when walking two to three blocks, and Dr. Charlton noted in March of 2018 that E.E. could walk

20  two blocks on flat ground.  *Id.* at 443, 449.  Dr. Richie reported in July of 2018 that E.E. had a low

21  tolerance for exercise for months and would have to stop to rest after walking two blocks, and she

22  reported in March of 2019 that E.E. experienced pain after walking two blocks.  *Id.* at 1861, 1895.

23  Additionally, Dr. Richie's 2020 note itself and E.E.'s testimony at her hearing indicate that E.E.

24

25  [7] The Commissioner's brief includes that Dr. Hsiao's notes from her January 2018 appointment
    with E.E. say that E.E. "[w]alked 15000 steps/day in Europe."  Def.'s Mot. (dkt. 25) at 5.  The
26  ALJ did not cite this anecdote in her opinion, and the Ninth Circuit has held that courts "review
    only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ
27  on a ground upon which [they] did not rely."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007)
    (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).  However, even if the ALJ had
28  noted this piece of evidence, it would still have to be assessed as part of all the relevant medical
    evidence from the record as a whole, rather than cherry-picked.

1    was limited in her physical abilities while traveling. *Id.* at 51, 4674.

2         Rather than addressing the evidence across the record regarding E.E.'s physical limitations,

3    including evidence that tends to support Dr. Richie's conclusions, the ALJ selected certain

4    instances of E.E.'s travel and exercise to discredit Dr. Richie's opinions. *See Holohan*, 246 F.3d

5    at 1207 (9th Cir. 2001) (finding error when an ALJ "selectively relied" on entries in a claimant's

6    medical record).  Because the ALJ's conclusion is not supported by addressing the relevant

7    evidence in the record, it could suggest that E.E. is being "penalized for attempting to lead [a]

8    normal [life] in the face of [her] limitations." *See George D. D. L. v. Saul*, No. 20-cv-03552-SK,

9    2021 WL 5205600, at *8 (N.D. Cal. Nov. 9, 2021).  The Court does not reach the question of

10   whether an ALJ *could* find E.E.'s travel and exercise to be sufficient evidence to discredit aspects

11   of Dr. Richie's assessments, but the ALJ here did not provide a full view of the relevant medical

12   evidence in doing so.  *See Garrison v. Colvin*, 759 F.3d 995, 1018 n.23 (9th Cir. 2014) (finding

13   that an ALJ is "not permitted to 'cherry-pick' from . . . mixed results to support a denial of

14   benefits" (quoting *Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011)).  The Ninth Circuit has

15   held that an "ALJ is 'not required to discuss every piece of evidence,'" but it has framed that rule

16   as excusing discussion of "'evidence that is neither significant nor probative.'"  *Hiler v. Astrue*,

17   687 F.3d 1208, 1212 (9th Cir. 2012) (citation omitted).  Here, the above evidence relating to

18   E.E.'s physical abilities could be potentially probative in determining whether Dr. Richie's

19   assessments of E.E.'s physical abilities were persuasive, regardless of whatever the appropriate

20   conclusion might be.  The ALJ therefore should have addressed it in a discussion of E.E.'s travel

21   and exercise in the context Dr. Richie's assessment of E.E.'s physical limitations.

22        The ALJ erred in failing to address relevant evidence in the medical record to conclude

23   that E.E.'s travel and exercise gave reason to reject Dr. Richie's opinions.  This error warrants

24   remand.

25   / / /

26   / / /

27   / / /

28   / / /

United States District Court
Northern District of California

## IV.     CONCLUSION

For the reasons discussed above, E.E.'s motion is GRANTED, the Commissioner's motion is DENIED, and the case is remanded for further administrative proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: July 26, 2022

_____
JOSEPH C. SPERO
Chief Magistrate Judge